**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

DELBERT E. HUDSON,

        Plaintiff,

vs.

TYSON FRESH MEATS, INC.,

        Defendant.

12-CV-2079-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.  **SUBJECT MATTER JURISDICTION.** . . . . . . . . . . . . . . . . . . . . . . . **2**

IV.  **SUMMARY JUDGMENT STANDARD.** . . . . . . . . . . . . . . . . . . . . . . **3**

V.    **FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

      A.    *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      B.    *Hudson's Employment at Tyson Prior to the Dispute at Issue.* . . . . . . **4**
      C.    *Disciplinary Action and Absences from Work.* . . . . . . . . . . . . . . . **5**
      D.    *January 2, 2012 Doctor Visit.* . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
      E.    *Hudson's Application for Leave.* . . . . . . . . . . . . . . . . . . . . . . . . **7**
      F.    *Return to Work.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      G.    *Termination.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

VI.  **ANALYSIS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

      A.    *FMLA.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
      B.    *Hudson's Claims.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
      C.    *Entitlement Claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
            1.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
            2.    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
            3.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
      D.    *Retaliation Claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
            1.    *Parties' arguments.* . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
            2.    *Applicable law.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**
            3.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*VII.   CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

## I.  INTRODUCTION

The matter before the court is Defendant Tyson Fresh Meats, Inc.'s ("Tyson") Motion for Summary Judgment ("Motion") (docket no. 12).

## II.  PROCEDURAL HISTORY

On October 9, 2012, Plaintiff Delbert E. Hudson filed a one-count Petition ("Complaint") (docket no. 3) in the Iowa District Court for Black Hawk County, Case No. LACV 120148, alleging that Tyson violated his rights under the Family and Medical Leave Act ("FMLA") by interfering with his exercise of his FMLA rights and by terminating his employment in direct retaliation to him applying for and taking FMLA leave.[1]  On November 6, 2012, Tyson removed the action to this court on the basis of federal question jurisdiction.  Notice of Removal (docket no. 2).  On November 15, 2013, Tyson filed the Motion.  On December 16, 2013, Hudson filed a Resistance (docket no. 15).  On December 24, 2013, Tyson filed a Reply (docket no. 18).  Neither party has requested oral argument and the court finds that oral argument is unnecessary.  The Motion is fully submitted and ready for decision.

## III.  SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Hudson's claim that Tyson violated Hudson's rights under the FMLA.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").[2]

---

[1] The court notes that the parties dispute whether Hudson took and was granted FMLA leave or non-FMLA leave.  In fact, Hudson alleges that he did not learn that Tyson classified his leave as non-FMLA leave until Tyson provided documents to Hudson in discovery that revealed such classification.

[2] The parties appear to disagree about whether there is diversity jurisdiction over

(continued...)

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Hudson and affording him all reasonable inferences, the material facts are these:

---

[2](…continued)
Hudson's claims. The court, however, declines to address this issue since federal question jurisdiction exists.

### A. Parties

Hudson is a resident of Waterloo, Iowa, who began working as a supervisor on the kill floor, or hot side, of Tyson's meat-packing plant in Waterloo, Iowa, in November 2010.

Tyson operates a meat-packing plant in Waterloo, Iowa, and in other locations throughout the state and country.

### B. Hudson's Employment at Tyson Prior to the Dispute at Issue

Hudson was a supervisor on the hot side at Tyson from November 1, 2010 to March 20, 2011. On March 20, 2011, Tyson transferred Hudson to a supervisor position on the cut floor, or cold side, of Tyson's Waterloo, Iowa, plant.

While working on the hot side at Tyson, Hudson had sporadic health-related absences. Whenever he requested time off from his supervisor, Hamdija Beganovic, he was given it, provided that he gave appropriate notice. In March 2011, Hudson informed the superintendent of the hot side, Don Brophy, that he did not feel like he was being treated fairly on the hot side and that he was yelled at for things beyond his control. Hudson told Brophy that he would leave if things did not change. Hudson then quit his job on the hot side.[3] Tyson offered Hudson a position on the cold side away from the

---

[3] In Hudson's deposition, he indicated that he quit his job and was rehired. Hudson Deposition, Tyson Appendix ("Tyson App'x") (docket nos. 12-3 through 12-18) at 8. However, in Hudson's affidavit that he filed after Tyson filed the Motion, he indicated that he "left work intending to quit" but that Tyson "asked [him] not to quit, and offered to transfer [him] to the cold side." Hudson Affidavit, Hudson Appendix ("Hudson App'x") (docket nos. 15-3) at 49-50. According to Brophy, when Hudson did not show up for work, he asked Hudson's girlfriend at the time, Colleen Rambo, where Hudson was, and Rambo responded that Hudson had quit. Since "a party cannot avoid summary judgment by contradicting his own earlier testimony," *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995), and "self-serving allegations . . . are insufficient to create a genuine issue of material fact," *Anuforo*, 614 F.3d at 807, the court finds that there is no genuine dispute that Hudson quit his job in March 2011.

department manager[4] who Hudson alleges mistreated him, and Hudson began working on the cold side on March 20, 2011.  Hudson performed adequately and met the expectations of his employer before the incident that led to his termination.

## C.  *Disciplinary Action and Absences from Work*

On December 27, 2011, Tom Hart, a night manager at Tyson's Waterloo plant, disciplined Hudson for not talking to one of his team members about a work injury and for not letting the team member go to the clinic.  Hudson was upset and frustrated by this disciplinary action.

On December 28, 2011, Hudson realized that "it would likely be some time before [he] would be able to return to work" because of his "existing state of health."  Hudson Affidavit, Hudson App'x at 50.  He told his then-girlfriend, Rambo, who worked and continues to work for Tyson, to tell Beganovic the following day that he "may be out for a few days."  Hudson Deposition, Tyson App'x at 18.  During the relevant period, Hudson did not know whether Rambo conveyed this message to Beganovic.[5]  However, the record indicates that Rambo did pass on a message from Hudson to Beganovic indicating that Hudson would either be late or that he would not be in on December 28, 2011.  On December 28, 2011, thirty minutes before his shift was scheduled to begin, Hudson also sent a text message to Beganovic indicating that he was having health issues, that he would not be at work for a few days and that he was trying to get in to see a doctor.[6]  While

---

[4] The record does not indicate the identity of this department manager, and Hudson does not recall the department manager's name.  However, Hudson does identify the department manager as a woman.  Hudson Deposition, Hudson App'x at 14.

[5] Hudson did not find out until during discovery whether Rambo conveyed his message to Hudson's supervisors at Tyson.

[6] Hudson does not have a copy of this text message and Beganovic denies receiving the text message.  However, reasonable jurors could come to different conclusions on

(continued…)

employed at Tyson, Hudson frequently communicated with Beganovic by text message, and the text messages went both ways. On at least one occasion prior to December 28, 2011, Hudson sent Beganovic a text message indicating that he would be absent from work, and the text was considered an acceptable notification. However, in May 2011, seven months prior to when Hudson sent the text message that is a subject of this dispute to Beganovic, Hudson signed a form that indicated that "[a]ll Management Team Members are expected to personally call their direct supervisor to report an unplanned absence or to report that they will be late." Attendance Expectations Memo, Tyson App'x at 77.

Hudson did not come to work on December 28, December 29 or December 30, 2011. Apart from the text message he sent to Beganovic on December 28, 2011, and the oral message he told Rambo to give to Beganovic, Hudson did not inform any of his supervisors that he would be absent on those days in any way, including via phone call. Hudson was not scheduled to work on December 31, 2011 or January 1, 2012, and the plant was closed in observance of New Year's day on January 2, 2012.

### D.  January 2, 2012 Doctor Visit

On December 28, 2011, Hudson attempted to see his doctor, Dr. Matthew Kettman, M.D., but he was unsuccessful in doing so because his doctor's office was closed for the holidays. Hudson was not able to see his doctor until the following Monday, January 2, 2012. In Dr. Kettman's notes, he stated that Hudson was in for a follow up for lower left-sided back pain that radiated down his left leg. Dr. Kettman also noted that Hudson was having weakness and tingling in his left leg, as well as a bulging disc. Prior to seeing Dr. Kettman, Hudson received three back injections that did not help his pain. Hudson reported that his pain was an 8-10 on the 1-10 scale and that it prevented him from sitting

---

[6](…continued)
whether the text message was sent and, accordingly, for purposes of summary judgment, the court construes the evidence in the light most favorable to Hudson and presumes that Hudson sent the text message.

or laying down comfortably. Hudson also reported that he had weakness in his arms and that he was starting to have headaches and nausea and decreased appetite and sleep. Dr. Kettman noted that Hudson may be depressed and was unable to work. Additionally, Dr. Kettman reported that Hudson had a kidney nodule. During the appointment, Dr. Kettman performed an EKG—which he told Hudson he was performing to rule out that he was having a heart attack—that returned no abnormalities, and Dr. Kettman also noted that he did not think that Hudson's arm pain was a variation of coronary artery disease.[7]

In summary, Dr. Kettman noted that Hudson's active problems included abdominal pain, backache, calcification of the lungs, kidney mass, depression, fatigue, flank pain, hyperlipidemia, hypertension, muscle aches, peripheral neuropathy, recent weight loss and smoking. Dr. Kettman diagnosed Hudson with back pain, diffuse pain, depression—for which he prescribed medication—lung nodules and bilateral arm pain. Notably, Dr. Kettman did not diagnose Hudson as having had a heart attack nor did Dr. Kettman take Hudson off work for any heart-related conditions between December 28, 2011 and January 12, 2012, the day Tyson terminated Hudson's employment. After his visit, Dr. Kettman signed a work release that stated the following:

> Patient Delburt [sic] Hudson has been under my care [from] 12/28/11 to 1/7/12 for illness [and] was unable to work[.]

January 2, 2012 Work Release, Tyson App'x at 32.

### E. Hudson's Application for Leave

On January 3, 2012, Hudson returned to Tyson and went directly to health services, where all leave documentation at Tyson is processed. Hudson knew that FMLA leave was available for employees with serious health conditions, and he intended to take FMLA

---

[7] In his deposition, Dr. Kettman noted that back and arm pain can be a non-typical presentation of angina, which occurs when the heart does not receive enough oxygen-rich blood. *See* Dr. Kettman Deposition, Hudson App'x at 28. Dr. Kettman also noted that nausea can be a symptom of cardiac problems.

leave.  At the time, Hudson had been employed by Tyson for more than twelve months and had worked in excess of 1250 hours in the preceding twelve-month period.  Moreover, Hudson had not used any FMLA leave in the previous twelve months.  Tyson also employed over fifty employees within seventy-five miles of the work site, making it a covered employer under the FMLA.

When Hudson went to health services, he gave a nurse the work release from Dr. Kettman, but he does not recall discussing with the nurse any of the specifics of his health issues.  Hudson also did not tell the nurse whether he was seeking FMLA or non-FMLA leave.  The nurse gave Hudson a "Leave of Absence Application."  On the application, there were options for different types of leave, including a "Medical (Non FMLA)" box, which had both work related and non-work related options, and an "FMLA" box.  Leave of Absence Application, Tyson App'x at 33.  Hudson signed and dated the application prior to the application being filled out, but later someone else checked the "Medical (Non FMLA)" box and indicated that Hudson would return to work on January 7, 2012.[8]

After leaving health services, Hudson encountered assistant plant manager Brent McElroy in the building.  Prior to speaking with McElroy that day, Hudson had never spoken with McElroy about any of his health conditions.  Hudson told McElroy that Dr. Kettman "was taking [him] out of work because [Dr. Kettman] thought that [he] might have had a mild heart attack and was going to put [him] in the hospital to run some test[s]."  Answers to Defendant's Interrogatories, Tyson App'x at 2.  According to Hudson, McElroy told him to "go see what was going on and get it taken care of."

---

[8] The parties dispute who filled out the application and who checked the "Medical (Non FMLA)" box.  The court finds that reasonable jurors could come to different conclusions on who filled out the application and checked the box and, accordingly, for purposes of summary judgment, the court construes the evidence in the light most favorable to Hudson and presumes that someone other than Hudson filled out the application and checked the box.

Hudson Deposition, Tyson App'x at 10. McElroy was not involved in processing or approving Hudson's leave application. After speaking with McElroy, Hudson left the plant.

On January 4, 2012, Jim Hook, Tyson's night shift human resources manager, approved Hudson's request for leave. Although there was space on the form for Hudson's supervisor, Beganovic, to approve the leave, Beganovic typically does not sign the forms.

### F. Return to Work

Hudson was not scheduled to work on January 7 or January 8, 2012, but he was scheduled to work on January 9, 2012. On the morning of January 9, 2012, Hudson called Dr. Kettman's office and indicated that he did not feel like he could return to work that day because he was still having pain. The following day, Dr. Ketmann signed another work release that stated the following:

> Patient Delbert Hudson has been under my care [from] 12-28-11 to 1-9-12 for illness [and] was unable to work[.]

January 10, 2012 Work Release, Hudson App'x at 59. Despite not feeling like he could return to work on the morning of January 9, 2012, Hudson did return to work that day. However, Beganovic instructed Hudson to speak with Hart rather than return to the floor.

### G. Termination

Although the record is not clear, it appears that Hart informed Teri Wray, Tyson's human resources manager, on January 9, 2012, that there may be an issue with Hudson. According to Wray's notes:

> On 12/27/11, . . . Hudson was disciplined for not talking to his [team members], as directed by . . . Hart. On 12/28/11, Hudson did not come in to work, but passed a message through his significant other . . . Rambo . . . that he would be late to work. Hudson also stated that he had texted this to his direct supervisor, . . . Beganovic. Beganovic told Hart that he had no such text message. Hudson never showed to work. On 12/29, 12/30, and 12/31, Hudson did not come to work and

did not notify anyone. On 1/3/12, Hudson brought in paperwork from a physician dated 1/2/12 to . . . McElroy. This document put Hudson out of work from 12/28/11—1/6/12, [return to work] 1/7/12 for an illness. Hudson did not call or show up to work 1/7/12.

When questioned, Hudson stated that he did not call his supervisor because of the stress and pain he was enduring. Hudson understands that he should have notified his supervisor, as this is what Tyson expects of all [team members]. Hudson went on to state that he didn't come to work because he was [fed] up and felt that he wasn't getting the support he needed from Beganovic. Hart stated that he has been spending a lot of time in B cut, and he talks to Hudson daily and never once has Hudson brought these issues up.

Summary:

Hudson had specific instructions to call-in prior to shift to his immediate supervisor if he was going to be late or miss work. On 12/27, 12/28, 12/29, 12/30, 12/31/11, and 1/7/12, Hudson did not come to work and did not notify his supervisor.[9] When questioned, Hudson stated that he was [fed] up and he knows that he should have called in. Furthermore, Hudson did not see a physician until 1/2/12 for an illness.

---

[9] The court notes that the January 2, 2012 Work Release stated that Hudson was unable to work from December 28, 2011 to January 7, 2012. However, the Leave of Absence Application indicated that Hudson's expected return date was January 7, 2012. Hudson claims that he was not scheduled to work on January 7, 2012, which is a Saturday and a day when he typically does not work. Given that Tyson has not put forth any evidence indicating Hudson was scheduled to work that day and because in the final termination documents, Tyson did not list that Hudson was terminated for failing to call in on January 7, 2012, the court presumes that Hudson was not scheduled to work on January 7, 2012. Moreover, the court notes that Wray's notes are not entirely accurate. Although Wray wrote that Hudson did not come into work on December 27, 2011, the record is clear that Hudson *did* come into work on December 27, 2011. *See* Brief in Support of Motion (docket no. 12-2) at 3; Hudson Deposition, Tyson App'x at 6; Hudson Affidavit, Hudson App'x at 50.

> All Tyson [team members] are required to call-in before [their] shift if they suspect that that they will be late or need to miss work. Management [team members] are no different and are, in fact, held to a higher standard of accountability. It should also be noted that Hudson has had a similar situation nearly 6 months ago on the kill floor. He was brought back to work and placed on the Cut floor following that incident.
>
> Recommendation:
>
> Termination

Wray Notes, Tyson App'x at 38 (emphasis omitted) (footnote added).

On January 9, 2012, Tyson human resources director Rick Nimrick approved of Wray's recommendation that Hudson be terminated. On January 11, 2012, Tyson reinstated Hudson from his leave of absence, which had been extended to January 9, 2012, pursuant to Dr. Kettman's second work release, effective January 10, 2012. However, Hudson was terminated on January 11, 2012, with the stated reason being his "fail[ure] to notify the company he was going to be absent from work on 12-28, 12-29, 12-30, and 12-31." Personnel Action, Hudson App'x at 53.

## VI. ANALYSIS

### A. FMLA

"The FMLA was enacted in the wake of increasing struggle between work and family life," *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 676 (8th Cir. 2001), and it "provides job security to employees who must miss work because of their own illnesses, to care for family members, or to care for new babies," *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2612(a)(1)(A)-(D)). "To help ease the growing tension between work and family, the FMLA establishes a right to unpaid family and medical leave for [eligible] employees . . . ." *Hatchett*, 251 F.3d at 676.

An employee is eligible for FMLA leave if the employee "has been employed . . . for at least 12 months by the employer with respect to whom leave is requested . . . and

. . . for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). An employer is covered by the FMLA if it is "engaged in commerce . . . [and] employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." *Id.* § 2611(4). Specifically, "an eligible employee is entitled to 12 workweeks of leave during any 12-month period if he or she has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002) (quoting 29 U.S.C. § 2612(a)(1)(D)). "A 'serious health condition' is any 'illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider.'" *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (quoting 29 U.S.C. § 2611(11)).

"An employee must provide notice to an employer that he plans to take FMLA leave." *Stallings*, 447 F.3d at 1050 (citing 29 U.S.C. § 2612(e)(2)). However, "[a]n employee need not invoke the FMLA by name in order to put an employer on notice that the [FMLA] may have relevance to the employee's absence from work." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000); *see also* 29 C.F.R. § 825.303(b) ("When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."). "'Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave.'" *Thorson*, 205 F.3d at 381 (quoting *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999)). "Whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury." *Phillips*, 547 F.3d at 909.

29 U.S.C. § 2615 lists certain prohibited acts under the FMLA. In its entirety, 29 U.S.C. § 2615(a) provides that the following are prohibited acts:

> (a) Interference with rights
>
> > (1) Exercise of rights
> >
> > It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
> >
> > (2) Discrimination
> >
> > It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a). The FMLA provides eligible employees with a private right of action against employers who engage in these prohibited acts. *Id*. § 2617(a)(2). When employees sue their employers for an alleged violation of the FMLA, they most commonly invoke § 2615(a)(1) and/or § 2615(a)(2). *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).

Until recently, the Eighth Circuit Court of Appeals recognized two types of claims arising under 29 U.S.C. § 2615(a)—interference claims and retaliation claims:

> Two types of claims exist under the FMLA: (1) "interference" or "(a)(1)" claims in which the employee alleges that an employer denied or interfered with his [or her] substantive rights under the FMLA and (2) "retaliation" or "(a)(2)" claims in which the employee alleges that the employer discriminated against him for exercising his [or her] FMLA rights.

*See Stallings*, 447 F.3d at 1050. Eighth Circuit law was clear that a subsection (a)(1) claim, or interference claim, "merely require[d] proof that the employer denied the

employee his [or her] entitlements under the FMLA," while a subsection (a)(2) claim, or retaliation claim, "require[d] proof of retaliatory intent." *Id.*

The Eighth Circuit began to alter the framework under which it analyzed FMLA claims in *Phillips*. In a concurring opinion in *Phillips*, Judge Colloton cited the *Stallings* framework and noted:

> By its terms, however, subsection (a)(2) does not apply to claims in which an employee "alleges that the employer discriminated against him [or her] for exercising his [or her] FMLA rights." Rather, that subsection makes it unlawful for an employer to discharge or otherwise discriminate against any individual "*for opposing any practice made unlawful* by [the FMLA]." 29 U.S.C. § 2615(a)(2) (emphasis added). This prohibition is analogous to the sort of "retaliation" claim that is familiar under Title VII, *see* 42 U.S.C. § 2000e-3(a), where an employee alleges that the employer discriminated against the employee for opposing what the employee reasonably believed to be violations of Title VII by the employer. . . . [*S*]*ee* . . . 60 Fed. Reg. 2180, 2218 (Jan. 6, 1995) ("[The FMLA] makes it unlawful for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the [FMLA]. This opposition clause is derived from Title VII of the Civil Rights Act of 1964 and is intended, according to the legislative history, to be construed in the same manner."). Some courts have properly applied § 2615(a)(2) in this manner. *E.g.*, *Gruppo v. FedEx Freight Sys., Inc.*, No. 08-1006, 2008 WL 4596332 (10th Cir. Oct. 15, 2008); *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301-02 (4th Cir. 1998).

*Phillips*, 547 F.3d at 914 (Colloton, J., concurring) (first alteration in original). In *Pulczinski*, this time in a majority opinion written by Judge Colloton, the Eighth Circuit established that there are "three types of claims arising under these two subsections." *Pulczinski*, 691 F.3d at 1005; *see also Brown v. City of Jacksonsville*, 711 F.3d 883, 890-91 (8th Cir. 2013).

The first type of claim, which arises under 29 U.S.C. § 2615(a)(1), "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the [FMLA]." *Pulczinski*, 691 F.3d at 1005; *see also Brown*, 711 F.3d at 890. While this claim was historically described as an "interference" claim, it may more appropriately be described "as an 'entitlement' claim—an employee claims the denial of a benefit to which he [or she] is entitled under the statute." *Pulczinksi*, 691 F.3d at 1005. Although the name of this type of claim changed, the proof required to assert this type of claim did not. As before, "[a]n employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.*

The second type of claim, which arises under 29 U.S.C. § 2615(a)(2), occurs where "an employee opposes any practice made unlawful under the FMLA" and the employer takes adverse action against the employee for that reason. *See id.* at 1005-06; *see also Brown*, 711 F.3d at 890. For example, "if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave[,] then the employer may not for that reason take adverse action against the employee who is engaged in the opposition." *Pulczinski*, 691 F.3d at 1006. This type of claim can be described as a "retaliation" claim, *id.*, and requires an employee to prove an employer's discriminatory intent. *See Brown*, 711 F.3d at 891.

The third type of claim, which was categorized as a subsection (a)(2) retaliation claim in the *Stallings* framework, "arises when an employer takes adverse action against an employee because the employee exercises rights to which he [or she] is entitled under the FMLA." *Pulczinski*, 691 F.3d at 1006. "In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him [or her] in the terms and conditions of employment." *Id.* This claim "likely arises under the rule of § 2615(a)(1) that an employer may not 'interfere with, restrain, or deny the exercise of

or the attempt to exercise' rights defined by the FMLA." *Id.* (quoting 29 U.S.C. § 2615(a)(1)); *see also Brown*, 711 F.3d at 891 (noting that this type of claim arises under § 2615(a)(1)). The Eighth Circuit articulated the distinction between this type of claim and the preceding two claims as follows:

> To distinguish the "entitlement" claim under § 2615(a)(1), and the "retaliation" claim under § 2615(a)(2), . . . it [is] helpful to describe this sort of complaint as a "discrimination" claim. *See* 29 C.F.R. § 825.220(c) ("The [FMLA]'s prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights.").

*Pulczinski*, 691 F.3d at 1006 (second alteration in original). Although pre-*Pulczinski* subsection (a)(1) claims did not require an employee to show an employer's discriminatory intent and subsection (a)(1) entitlement claims *still* do not require an employee to show an employer's discriminatory intent, a subsection (a)(1) retaliatory discrimination claim requires that the employee "prove that the employer was motivated by the employee's exercise of rights under the FMLA" when making the adverse employment decision. *Id.; see also Brown*, 711 F.3d at 891 (noting that "a 'discrimination' claim under § 2615(a)(1)" and "a 'retaliation' claim under § 2615(a)(2)" both "require proof of the employer's discriminatory intent").

Regardless of the type of claim, "[t]he FMLA 'provides no relief unless the employee has been prejudiced by the violation.'" *Pulczinski*, 691 F.3d at 1006 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

## B. Hudson's Claims

In the Complaint, Hudson indicates that "[u]pon his return from FMLA leave, [he] suffered adverse employment actions in *interference* of his FMLA rights and in direct *retaliation* for having taken that leave, which was a clear violation of the FMLA." Complaint ¶ 12 (emphasis added).

The parties have framed Hudson's first claim as an "interference" claim arising out of 29 U.S.C. § 2615(a)(1). The court agrees that this claim arises under § 2615(a)(1), but, as directed by the framework of *Pulczinski*, the court will discuss this claim in terms of an "entitlement" claim, because Hudson is asserting that he was deprived of a substantive right under the FMLA when he was granted non-FMLA leave rather than FMLA leave. *See* Resistance at 12. As discussed above, regardless of whether this claim is called an "entitlement" claim or an "interference" claim, the proof required remains the same.

The parties have framed Hudson's second claim as a "retaliation" claim arising out of 29 U.S.C. § 2615(a)(2). In this claim, Hudson asserts that Tyson terminated his employment in retaliation for him applying for and taking FMLA leave.[10] Hudson's

---

[10] As discussed above, when Hudson filed the Complaint, he believed that he had applied for FMLA leave and that Tyson had granted him FMLA leave. Accordingly, Hudson alleged that Tyson retaliated against him for taking FMLA leave. In the Resistance, however, Hudson states:

> [Hudson] intended to apply for and believed that he had applied for benefits under the FMLA. [Hudson] did not realize, until [he] had the benefit of discovery, that what he had been granted by Tyson[] was non-FMLA leave. In light of that fact, this case seems to present more of an interference claim than a retaliation claim.

Resistance at 12 (citations omitted). Hudson compares his case with *Dollar v. Smithway Motor Xpress, Inc.*, 787 F. Supp. 2d 896 (N.D. Iowa 2011), *vacated in part on other grounds*, 710 F.3d 798 (8th Cir. 2013), a case in which, according to Hudson, "the [d]efendant never offered [the] plaintiff FMLA leave, and [the plaintiff] never specifically requested or took any FMLA leave. However, the [d]istrict [c]ourt found that an interference claim existed because the plaintiff was eligible for leave, the plaintiff had a serious health condition, the plaintiff provided adequate notice, and the benefits were denied." *Id.* After conceding that his claim is more of an interference claim, Hudson immediately goes on to discuss why his FMLA interference claim should proceed to trial, seemingly acknowledging that what he characterized as a retaliation claim has no merit because Tyson did not grant Hudson FMLA leave. However, in the final pages of the

(continued...)

retaliation claim should be classified as a discrimination claim, arising under subsection (a)(1), because he claims that he was discharged for taking leave. However, the court will analyze Hudson's retaliation/discrimination claim as a pre-*Pulczinski* retaliation claim, because Tyson did not object to this characterization by Hudson. *See Quinn v. St. Louis Cnty.*, 653 F.3d 745, 754 n.7 (8th Cir. 2011). The court notes that the outcome of this issue does not turn on how Hudson's claim is classified; Hudson is required to show discriminatory intent whether his claim is analyzed as a subsection (a)(2) pre-*Pulczinski* retaliation claim or a subsection (a)(1) *Pulczinski* discrimination claim. *See Brown*, 711 F.3d at 891.[11]

## C. Entitlement Claim

### 1. Parties' arguments

In the Motion, Tyson does not specifically move for summary judgment on Hudson's interference, or entitlement, claim, but only moves for summary judgment on Hudson's retaliation claim. In the Resistance, Hudson argues that his entitlement claim should proceed to trial and not be subject to the Motion because Tyson did not move for summary judgment on the entitlement claim and because only one motion for summary judgment is allowed pursuant to the court's February 8, 2013 Order (docket no. 8).

In its Reply, Tyson argues that Hudson admitted in his deposition that he was granted a leave of absence under the FMLA, which precludes a finding that Tyson

---

[10](...continued)
Resistance, Hudson argues that Tyson failed to prove that it terminated Hudson for reasons unrelated to Hudson's attempt to exercise his FMLA rights, which is an argument based on a "retaliation," or what is now considered a "discrimination," claim—not a claim that Tyson denied Hudson substantive rights under the FMLA. Since Hudson makes arguments related to a discriminatory retaliation claim, the court will address this claim as well.

[11] Hudson does not set forth facts or argue that he has a subsection (a)(2) retaliation claim, as such claim is classified under the *Pulczinski* framework

interfered with his FMLA rights by denying him anything he was entitled to.[12] Moreover, Tyson asserts that it relied on the following exchange in Hudson's deposition in concluding that Hudson was not pursuing an entitlement claim:

> Q. And, sir, I'm looking at paragraph 7[13] [and 12[14] of the Complaint], is it your claim in this lawsuit that Tyson retaliated against you for requesting and taking FMLA leave?
> A. Yes, I believe so.
> Q. And is that the basis of your lawsuit here, to your understanding, sir?
> A. Yes, sir.

Reply at 9 (quoting Hudson Deposition, Tyson App'x at 20). Tyson argues that Hudson should not be allowed to pursue his entitlement claim because Hudson did not amend the answer given in his deposition to note that he was pursuing an entitlement claim, in addition to the retaliation claim, within the thirty days required by Federal Rule of Civil Procedure 30(e).

Even if Hudson is not barred from pursuing his entitlement claim, Tyson argues that the court should grant summary judgment on the entitlement claim because his claim has

---

[12] The court notes that this is a peculiar argument given that in other parts of the record Tyson asserts that Hudson was *not* granted FMLA leave. As discussed above, Hudson did not know that he had not been granted FMLA leave until discovery, presumably after he was deposed. Accordingly, Tyson's argument that Hudson does not have an entitlement claim because he admitted to receiving FMLA leave at his deposition has no merit.

[13] Paragraph seven states: "Subsequent to his return from FMLA leave, [Hudson] was immediately terminated in retaliation for having taken the leave." Complaint ¶ 7.

[14] The court notes that this exchange was misquoted in the Reply. During the deposition, Tyson referenced paragraph twelve as well as paragraph seven. Paragraph twelve states: "Upon his return from FMLA leave, [Hudson] suffered adverse employment actions in interference of this FMLA rights and in direct retaliation for having taken that leave, which was a clear violation of the FMLA." *Id.* ¶ 12.

no merit. Tyson contends that it "made clear in seeking summary judgment that '. . . Hudson identified nothing that would qualify him for FMLA leave even had he chosen to seek it.'" Reply at 10 (quoting Brief in Support of Motion at 13). Tyson also argues that Hudson did not indicate that he was requesting FMLA leave to anyone involved in the leave process at Tyson and did not present any illness or set of facts to anyone involved in the process that could warrant FMLA leave. Tyson notes that Dr. Kettman's note, which Hudson showed to health services, only indicated that "Hudson has been under my care 12/28/11 to 1/7/12 for illness [and] was unable to work." January 2, 2012 Work Release, Tyson App'x at 32. Tyson argues that although Hudson claims to have told McElroy, after he signed the leave form and left health services on January 3, 2012, that Dr. Kettman was taking him off work due to what might have been a mild heart attack, Hudson's statement to McElroy was false. Tyson asserts that Dr. Kettman did not diagnose Hudson with a heart attack or heart issues while Hudson was employed at Tyson, which Tyson states is supported by Dr. Kettman's testimony. Accordingly, Tyson argues that since no grounds to support FMLA leave existed at the time of the alleged interference with Hudson's entitlement, it did not interfere with any of Hudson's substantive rights under the FMLA. Moreover, Tyson contends that Hudson was not prejudiced by any potential interference with his FMLA rights because although he was not granted FMLA leave, he was granted non-FMLA leave.

Hudson argues that he was eligible for FMLA leave based on his work experience[15] and that he had a "'serious health condition'" that involved "'continuing treatment by a healthcare provider.'" Resistance at 15 (quoting 29 C.F.R. § 825.113(a)). Hudson also claims that he provided Tyson with adequate notice of his need for FMLA leave because

_____

[15] Tyson does not dispute that Hudson was an "eligible employee" pursuant to 29 U.S.C. § 2611(2) and that Tyson is a "covered employer" pursuant to 29 U.S.C. § 2611(4).

he informed Tyson through a designated spokesperson, Rambo, that he would be absent from work on December 28, 2011, and because he sent Beganovic a text message that indicated he would be gone for multiple days because of a health condition. Even if this was not adequate notice, Hudson contends that he gave adequate notice on January 3, 2012, the third business day after he was unable to work, which was the deadline pursuant to Tyson's policy. Hudson also claims that he was not required to specifically state he was seeking FMLA leave; rather, Hudson contends that he intended to seek FMLA leave and did not indicate that he was *not* seeking FMLA leave. Hudson also argues that Tyson failed to prove the reason for his termination was unrelated to his attempt to exercise his FMLA rights, which, accordingly, entitles Hudson to relief.

### 2. *Applicable law*

The Eighth Circuit has summarized an interference claim, or entitlement claim,[16] as follows:

> An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise[] of any right contained in the FMLA. 29 U.S.C. § 2615(a)(1). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b). An employer's action that deters an employee from participating in protected activities constitutes an "interference" or "restraint" of the employee's exercise of his [or her] rights. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). "A violation of this provision creates what is commonly known as the interference theory of recovery." *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). When an employer

---

[16] In *Brown*, 711 F.3d at 890, these terms are used synonymously, and prior case law regarding interference claims is relevant to Hudson's entitlement claim.

attaches negative consequences[17] to the exercise of protected
rights, it has "chilled" the employee's willingness to exercise
those rights because he or she does not want to be fired or
disciplined for doing so. *Bachelder*, 259 F.3d at 1124.

*Stallings*, 447 F.3d at 1050 (footnote added).

"An employee can prevail under an interference theory if he was denied substantive
rights under the FMLA for a reason connected with his FMLA leave." *Id.* The Eighth
Circuit "has recognized than an employee can prove interference with an FMLA right
regardless of the employer's intent." *Id.* (citing *Throneberry*, 403 F.3d at 979).

"The initial burden of proof in an FMLA interference case is on the employee to
'show only that he or she was entitled to the benefit denied.'" *Ballato*, 676 F.3d at 772
(quoting *Stallings*, 447 F.3d at 1050) (internal quotation marks omitted). Accordingly,
interference claims can be described "as an 'entitlement' claim—an employee claims the
denial of a benefit to which he is entitled under the statute." *Pulczinski*, 691 F.3d at 1005.
"The FMLA 'provides no relief unless the employee has been prejudiced by the
violation.'" *Id.* at 1006 (quoting *Ragsdale*, 535 U.S. at 89)

### 3.    *Application*

As an initial matter, the court concludes that Hudson did not forfeit his entitlement
claim by not mentioning it at his deposition. This case is unlike *Carter v. Ford Motor Co.*,
561 F.3d 562 (6th Cir. 2009), a case to which Tyson cites, in which the Sixth Circuit
Court of Appeals upheld the lower court's refusal to allow the plaintiff's claim to go
forward because the defendant had no notice of the claim and because the plaintiff
expressly disavowed the claim during the course of discovery. *See id.* at 569. In this
case, Tyson had notice of the entitlement claim from the plain language of the Complaint

---

[17] Negative consequences include using "the taking of FMLA leave as a negative
factor in employment actions, such as hiring, promotions or disciplinary actions." *Ballato
v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012) (quoting 29 C.F.R. § 825.220(c)).

and Hudson never specifically refuted that he was pursuing an entitlement claim as well as a retaliation claim.

Although Hudson did not forfeit his entitlement claim by not referencing it in his deposition, Tyson also did not forfeit the ability to move for summary judgment on the entitlement claim by not specifically discussing the entitlement claim in the Motion. In the Motion, Tyson made several arguments that would preclude Hudson from prevailing on the retaliation claim, as well as the entitlement claim. Given the nature of this dispute, the court does not find it appropriate to preclude Tyson from seeking summary judgment on the entitlement claim in addition to the retaliation claim. Accordingly, the court will address the merits of Tyson's argument that the court should grant summary judgment on the entitlement claim in its favor.

For purposes of Hudson's entitlement claim, the court assumes, *arguendo*, that Hudson was entitled to FMLA leave, gave adequate notice to Tyson regarding such leave and that Tyson did not grant Hudson FMLA leave. However, Hudson does not dispute that Tyson granted him sick leave, despite it not being classified as FMLA leave. *See* Resistance at 9 ("[Hudson]'s timely request for leave was neither delayed nor denied. Instead, on January 4, 2012, [Hudson]'s request for leave was promptly approved by Jim Hook, the [Human Resources] Manager."); Beganovic Deposition, Hudson App'x at 5-6; Leave of Absence Application, Tyson App'x at 33. Moreover, Hudson does not allege that "he was prejudiced by the misclassification of this absence . . . [or that] [h]e was . . . denied compensation or benefits." *See Pulczinski*, 691 F.3d at 1007. Eighth Circuit law is clear that "[t]he FMLA 'provides no relief unless the employee has been prejudiced by the violation.'" *Id.* at 1006 (quoting *Ragsdale*, 535 U.S. at 89). Accordingly, the court shall grant the Motion to the extent that it requests the court grant summary judgment in favor of Tyson with respect to the entitlement claim.

## D. Retaliation Claim

### 1. Parties' arguments

Tyson argues that Hudson has no direct evidence that it discriminated against Hudson for taking FMLA leave, which means the case should be analyzed under the *McDonnell Douglas* burden-shifting framework. Tyson also contends that Hudson has not shown that he exercised any right afforded by the FMLA, which is the first requirement to establish a *prima facie* case of retaliation, because Hudson did not apply for and take FMLA leave. Moreover, Tyson asserts that Hudson cannot show "that there was a causal connection between his non-existent exercise of rights and the end of his employment," which is the third requirement to establish a *prima facie* case of retaliation. Brief in Support of Motion at 9. Tyson concedes that there was an adverse employment action, which is the second requirement to establish a *prima facie* case of retaliation under the FMLA. Even if Hudson could establish a *prima facie* case of retaliation, Tyson argues it can show that Hudson was terminated for a "legitimate, non-retaliatory reason" that was not pretextual. *Id.*

Hudson does not specifically address the retaliation claim in his Resistance because he states that "this case seems to present more of an interference claim th[a]n a retaliation claim" given that Hudson was not granted FMLA leave despite meeting the requirements. Resistance at 12. However, in discussing his interference/entitlement claim, Hudson does contend that Tyson has not met its burden to show that it terminated Hudson for a reason unrelated to his attempted exercise of his FMLA rights.[18]

### 2. Applicable law

The Eighth Circuit has summarized an FMLA retaliation claim as follows:

---

[18] Hudson seems to conflate an interference/entitlement claim with a retaliation/discrimination claim. Nonetheless, the court will construe the pleadings in the light most favorable to Hudson.

The FMLA prohibits employers from discriminating against an employee for asserting his rights under the [FMLA]. *Darby v. Bratch*, 287 F.3d 637, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2615(a)(2)). "This prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action." *Id.* "Basing an adverse employment action on an employee's use of leave . . . is therefore actionable." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002).

*Stallings*, 447 F.3d at 1051 (last alteration in original). "[P]roof [of retaliatory discrimination] may come from direct evidence or indirect evidence using the *McDonnell Douglas* burden-shifting framework." *Brown*, 711 F.3d at 891 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973)). If there is no direct evidence of discriminatory retaliation, a plaintiff must establish a *prima facie* case of retaliatory discrimination. *See Philips*, 547 F.3d at 912. "To establish a *prima facie* case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the [FMLA], (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Pulczinski*, 691 F.3d at 1007. "An employee can establish a causal link between her [or his] protected activity and the adverse employment action through 'the timing of the two events.'" *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (quoting *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1079 (8th Cir. 2005)). Although "[t]he mere coincidence of timing . . . is rarely sufficient to establish the causation element," the Eighth Circuit has held that "temporal proximity alone was sufficient to create an inference of the causal link," when the temporal proximity is "'very close.'" *Id.* (quoting *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005)).

If the employee establishes a *prima facie* case of retaliatory discrimination, the employer must "come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action." *Phillips*, 547 F.3d at 912. The employer's burden "'is not onerous

and the showing need not be made by a preponderance of the evidence.'" *Id.* (quoting *Wallace*, 415 F.3d at 860).

If the employer is able to do so, the employee "must come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination." *Id.* "The employee may demonstrate pretext by two different methods." *Stallings*, 447 F.3d at 1052. "'First, a plaintiff may succeed indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)) (internal quotation marks omitted). "Under this method, the employee must rebut the employer's 'underlying factual claims' by establishing that the employer's explanation has no basis in fact." *Id.* (quoting *Wallace*, 442 F.3d at 1120). "Second, the plaintiff may prove pretext 'directly by persuading the court that a [prohibited] reason more likely motivated the employer.'" *Id.* (alteration in original) (quoting *Wallace*, 442 F.3d at 1120) (internal quotation marks omitted). "Under this method, the employee rebuts 'the employer's ultimate factual claim regarding the absence of retaliatory intent.'" *Id.* (quoting *Wallace*, 442 F.3d at 1121). "The employee must demonstrate 'that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motivating explanation.'" *Id.* (quoting *Wallace*, 442 F.3d at 1121).

### 3. Application

Hudson has put forth no direct evidence sufficient to establish that Tyson retaliated against him for exercising his FMLA rights. Hudson admitted in his deposition that he has no knowledge of anyone's employment at Tyson being terminated for taking FMLA leave, that he has no evidence that Wray was biased against employees who took FMLA leave and that he has no knowledge of Wray making inappropriate comments about his or any other employee's FMLA leave. Hudson also acknowledges that he is not aware of Beganovic or Hart making any inappropriate comments about his or any other employee's

use of FMLA leave. Hudson also does not dispute that Wray personally granted many requests for FMLA leave. Accordingly, Hudson has put forth no direct evidence of retaliatory discrimination and, therefore, Hudson must establish a *prima facie* case of retaliatory discrimination pursuant to the *McDonnell Douglas* burden shifting framework.

To establish a *prima facie* case of retaliatory discrimination, Hudson must first show that he engaged in activity protected under the FMLA. The court assumes, *arguendo*, that Hudson engaged in a protected activity when he requested leave on January 3, 2012, because he was an eligible employee, Tyson was a covered employer and Hudson provided Tyson with adequate notice that he may require FMLA leave.

The second element Hudson must show is that he suffered an adverse employment action after requesting FMLA leave. Here, Tyson concedes that Hudson suffered an adverse employment action when Tyson terminated his employment.

Finally, Hudson must show a causal connection between the adverse employment action and his request for FMLA leave. Given the exceedingly close temporal connection between the protected conduct and the adverse employment action, Hudson has demonstrated a causal link between the protected activity and the adverse employment action. *See Hite*, 446 F.3d at 866. Accordingly, Hudson has demonstrated a *prima facie* case of retaliatory discrimination.

Even though Hudson put forth a *prima facie* case of retaliatory discrimination, his claim must fail because Tyson has "come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action," *Phillips*, 547 F.3d at 912, and Hudson has not demonstrated that this reason is pretextual. Tyson states that it terminated Hudson's employment because Hudson "was a no call/no show for multiple days." Brief in Support of Motion at 9. Pursuant to Tyson's policies, "[a]ll Management Team Members are expected to personally call their direct supervisor to report an unplanned absence or to report that they will be late." Attendance Expectations Memo, Tyson App'x

at 77. Although Hudson sent a text message to Beganovic indicating that he may be gone for a few days and he told his then-girlfriend to tell Beganovic that he would be out for a few days, there is no indication that Wray or anyone else involved in the termination process knew that Hudson would be absent on any day after December 28, 2013. In fact, Hudson even concedes that he has no evidence to show that Wray did not genuinely believe Hudson was a no call/no show on the days he was absent, which is her stated reason for Hudson's termination. Certainly, Tyson has met its burden, which is not onerous, of a legitimate, nondiscriminatory reason for adverse employment action given the fact that Hudson was a no call/no show for three days, which is indisputedly what Wray believed. This is especially true considering that less than a year earlier, Hudson had quit work only to have Tyson hire him back and Hudson admitted to Wray that he did not call to report his absences because he was upset with Beganovic.

Since Hudson has not in any way demonstrated that Tyson's reason for terminating him was pretextual, his claim must fail. Hudson has not demonstrated that Tyson's proffered explanation has no basis in fact or that it is more likely that Tyson terminated Hudson's employment because he asserted his FMLA rights than because he was a no show/no call for three days. There is absolutely no indication whatsoever that anyone at Tyson involved with Hudson's termination knew that Hudson had sought FMLA leave, much less that he had been given FMLA leave, nor is there any indication that anyone at Tyson had any animus whatsoever toward employees who sought or took FMLA leave. Hudson fails to meet his burden to "come forward with evidence that creates an issue of fact as to whether the asserted reason [for his termination] was pretext for discrimination." *See Phillips*, 547 F.3d at 912. Accordingly, the court shall grant the Motion to the extent that it requests the court grant summary judgment in favor of Tyson with respect to the retaliation claim.

### VII. CONCLUSION

In light of the foregoing, Tyson's Motion (docket no. 12) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Tyson Fresh Meats, Inc. and against Delbert E. Hudson and to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED** this 26th day of February, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA